**Helen Russell PIERCE, Executrix of the Estate of George Washington Pierce, Deceased, Plaintiff,**

v.

**ALLEN B. DU MONT LABORATORIES, Inc., Defendant.**

**Civ. A. No. 1624.**

United States District Court
D. Delaware.

Sept. 12, 1958.

See also 156 F.Supp. 237.

---

Thomas Cooch (of Connolly, Cooch & Bove), Wilmington, Del., David Rines and Robert H. Rines (of Rines & Rines), Boston, Mass., of counsel, for plaintiff.

Richard F. Corroon (of Berl, Potter & Anderson), Wilmington, Del., Floyd H. Crews and Donald J. Overocker (of Darby & Darby), New York City, of counsel, for defendant.

LAYTON, District Judge.

This is a motion for summary judgment by the defendant in a suit wherein the plaintiff charges infringement of six patents issued to the plaintiff's deceased husband, Professor George W. Pierce. The patents are Numbers 2,133,642 (642), 2,133,643 (643), 2,133,645 (645), 2,133,646 (646), 2,133,648 (648) and 2,133,070 (070).[1] The first five patents were issued simultaneously on October 18, 1938, and have expired. Patent numbered 070, issued December 16, 1941, will expire on December 16, 1958.

The Complaint alleges that the defendant was or is infringing the plaintiff's exclusive rights under these patents by manufacturing and selling electrical and electromechanical vibrator systems including the so-called Pierce oscillator.

Primarily, the scope of these patents falls within the field of radio broadcasting. Prior to the issuance of these patents in 1938, there existed a strong need for controlling the frequency of oscillating electrical circuits. Radio communi-cation is transmitted by carrier waves generated from the transmitter by an alternating current of electricity flowing in and out of an antenna. Radio waves are produced when the current oscillates at high frequency. Inasmuch as communication between sender and receiver is possible only when each is tuned to the same frequency, it is important that the frequency of the waves remain constant.

Prior to 1912, de Forest had found that the thermionic vacuum tube, or triode, could be utilized to generate electric oscillations but the principal fault with his tube was that when the various elements in the circuit became heated, a considerable variation in frequency resulted.

Eventually, the solution came about through the use of piezoelectric crystals. As long ago as 1880, the Curie brothers had conducted some experiments with these crystals but it was not until Professor Cady of Wesleyan University and later, Professor Pierce, began research in this field that important results were accomplished. Prof. Pierce discovered a process whereby a circuit could oscillate at a satisfactorily constant frequency without the use of inductive coils or condensers. In the Pierce oscillator, a piezoelectric crystal is inserted in the input circuit, between the cathode and grid or control electrode, or beween the grid, or control electrode, and the anode. In the first-named system, the tunable resonant output circuit (inductance coil and condenser) is tuned to a higher frequency than the natural frequency of the crystal. When the system is in operation, it will produce oscillations at a constant frequency determined by the natural frequency of the crystal. One of the important incidents of the Pierce oscillator is that with the aid of a piezoelectric crystal having only two electrodes, it is not necessary to rely upon mechanical feedback through a four elec-

---

1. The infringement involves the following claims:

No. 642—3, 24, 26, 40, 49, 51, 52, 54, 55, 56, 61–68, 105 and 106.

No. 643—1, 4, 9, 10, 26, 29, 66, 68, 70 and 71.

No. 645—9, 10 and 22.

No. 646—5, 9, 16, 22 and 23.

No. 648—5, 23, 24, 30 and 31.

No. 070—1, 6, 8, 14, 16, 17 and 30.

trode crystal to obtain oscillations of high frequency such as are needed in radio transmission, and this results with the certainty that the oscillator will not oscillate except at that specific high frequency.

The Pierce oscillator is in world-wide use, and Prof. Pierce is regarded as having made an outstanding contribution in the above described field.

When he invented the Pierce oscillator, he invented certain other subsidiary electrical systems for which he attempted to obtain a single patent. This application included not only general claims for the use of a piezoelectric crystal to control the frequency of an oscillating system but also specific claims for the combination of a radio transmitter and receiver in which these crystals could be used. The Patent Office decided that more than one invention was described in the application and ordered a division. Accordingly, Pierce filed a number of additional applications resulting in patents some of which are involved here. One of these patents was No. 1,789,496, which had expired prior to the time that defendant had commenced the acts of infringement alleged here.

Patent No. 1,789,496, consisting of three claims, is for a radio transmitting and receiving system in combination, having a means of keeping the oscillations of both the transmitter and receiver at the same constant frequency. Claim 1 specifically mentions the use of a piezoelectric body for controlling the frequency of these oscillations and that would seem to allow the piezoelectric crystal-controlled oscillators shown in the Cady patent No. 1,472,583 to be used as an element in the combined transmitting and receiving system. Claim 2 specifies the use of an electro-mechanical vibrator having two electric terminals in a single vacuum tube circuit, which circuit oscillates at a frequency widely independent of the other elements in the circuit. It thus apparently specifies the Pierce oscillator. Claim 3 is much broader in that it calls for any kind of prior art electromechanical vibrator to control the frequency.

Action on Pierce's other applications, which resulted from the order for a division was delayed because of requests for a fuller explanation of the properties of piezoelectric crystals and the failure to pay on time the required final fee. On April 20, 1930, the Patent Office issued a patent to John M. Miller covering claims 51, 52, 54, 55, 56 and 61 to 68 inclusive of Pierce's now patent No. 2,133,642. Litigation resulted in the holding that Pierce and not Miller was the inventor of the Pierce oscillator represented by the above claims. Miller v. National Broadcasting Company, Inc., 3 Cir., 79 F.2d 657; Miller v. Pierce, 97 F.2d 141, 25 C.C.P.A., Patents, 1195. Thereafter, on October 18, 1938, the Pierce patent, No. 2,133,642, and the other four patents involved in this suit were issued.

After the expiration in 1948 of the protection provided by patent No. 1,789,-496, various business concerns began to produce electrical vibrator systems, which Pierce believed infringed his six patents, which had not, by that time expired. He entered nine suits in several different circuits against various defendants. This is the eighth of these suits.

The history of three of these suits is pertinent here. Two of them were filed in the United States District Court for the District of Massachusetts [2] and the third in the United States District Court for the District of Florida.[3]

In American Communications Co. v. Pierce, 1 Cir., 208 F.2d 763, both parties moved for summary judgment only on claims 51, 52, 54, 55, 56 and 61 to 68, inclusive, of the basic patent, No. 2,133,642. The district court, 111 F.Supp. 181, holding that the claims were valid and infringed, granted plaintiff's motion and

2. American Communications Co. v. Pierce, 1 Cir., 208 F.2d 763; Pierce v. Hewlett-Packard Company, D.C.Mass., 125 F. Supp. 329.

3. Pierce v. Aeronautical Communications Equip., Inc., 5 Cir., 1958, 255 F.2d 458.

denied defendant's motion. The Court of Appeals reversed, holding that generic patent No. 2,133,642 for an electrical system relating particularly to the use of a piezoelectric crystal for producing at a constant frequency the oscillation of such system, when read specifically on the combined transmitting and receiving systems discloses no invention distinct and separate from that of patent No. 1,789,496, and that it would not extend the plaintiff's monopoly under the mantle of patent No. 2,133,642. The Court reasoned that neither claim 1 nor claim 3 of patent No. 1,789,496 revealed any distinctive contribution to the art of frequency stabilization or radio systems; and when analyzing claim 2 with a typical claim of patent No. 2,133,642, claim 67, clause by clause, it concluded that the only significant difference indicated in the claims is the use to which the piezoelectric crystal may be put. Claim 2 of patent No. 1,789,496, narrows the operation of the crystal to the combined transmitting and receiving system whereas claim 67 of patent No. 2,133,642, more broadly states its use in any generating system. But as the radio system described by Pierce was held not to be novel in and of itself, the only inventions were the position and the method in which the two-electrode piezoelectric crystal was used in the combination.

In the other case, the district court in Pierce v. Hewlett-Packard Company, 125 F.Supp. 329, granted defendant's motion for summary judgment, declaring the above claims of patent No. 2,133,642 invalid. The Court of Appeals affirmed on the authority of the American Communications Co. case to the effect that there was double patenting in that the plaintiff's patents Nos. 1,789,496 and 2,133,-642 made only one distinctive contribution, which was the novel use of the two-electrode piezoelectric crystal in a single vacuum tube circuit. 1 Cir., 220 F.2d 531.

In the Aeronautical Communications Equip., Inc., suit, the Fifth Circuit Court of Appeals reversed the Florida District Court's granting of a motion for summary judgment in favor of the defendant upon the grounds of double patenting. Several reasons were assigned for the reversal.

(1) That the lower court considered but 13 of the 20 claims in patent (642) and that the plaintiff was entitled to a "considered opinion" based upon the presentation of evidence and expert testimony to prove that the claims not in litigation contained improvements or inventions different from those involved in the 13 claims of (642) which were considered.

(2) The order of the Patent Office requiring a division of plaintiff's original application for the reason that it contained separate and distinct patents was entitled to great weight and should not lightly be overruled.

(3) The plaintiff should be offered the right to show the invalidity of (496), the earlier, expired, patent and base his claim or claims upon the later patents thus extending the period of his protection.

(4) The inequitable position into which the plaintiff was placed by the order of the Patent Office compelling a division only to be met by the defendant's claim of double patenting. If the plaintiff actually made a significant contribution with the oscillator, he is entitled to a patent on it alone to prevent its use by others in combination.

(5) The plaintiff should now be permitted to prove that his oscillator is not specifically claimed in (496) and that, at most, he was protected in that patent to the extent it was used in the combination there described.

This case is too similar to distinguish from those in the Massachusetts and Florida Districts. In the face of the contradictory results arrived at by the First and Fifth Circuit Courts, should defendant's motion be granted?

 I am impressed by the fact that it is strongly probable that Prof. Pierce has made a significant contribution with the Pierce oscillator. If this is so, he is entitled to a patent on it carrying with it

all the protection to which an inventor is entitled for the full seventeen years of the life of the patent. It was not his fault that he was required to split his original application into several parts. As said by Biesterfield, Patent Law, p. 118, "* * * there have been many instances where patents have been held invalid because they were patentably indistinguishable in view of a preceding patent to the same inventor. Accordingly, the general risk is much less to retain in one patent, if possible, a number of inventions." This Prof. Pierce apparently attempted to do but was required to make a division. Having acquiesced in the decision of the Patent Office by filing divisional applications, he was eventually awarded several patents. Two consequences flow from this result. (1) The plaintiff, having acquiesced in the requirement of the Patent Office only to be met by the defense of double patenting, is placed in an unenviable and unequitable position and (2), the decision of the Patent Office that more than one invention was contained in the original application, is entitled to great weight. In re Cady, 77 F.2d 106, 22 C.C.P.A., Patents, 1190; National Tube Co. v. Steel and Tubes, 3 Cir., 90 F.2d 52.

Moreover, as a corollary to the above, in asserting the defense of double patenting the defendant is, in effect, claiming that one or more of the patents in suit are invalid and the burden of establishing invalidity of a patent is not only on the party asserting it but is a heavy one. Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983.

Not only is there more in issue here than in the First Circuit cases but that Circuit's decisions failed to take into account those principles announced in the Cady and Steel Tube decisions, the latter of which is an opinion of this Circuit.

Last, but not unimportant, is my unfamiliarity with patent matters in general and, in particular, with the principles of piezoelectricity. An experienced patent judge might effectively dispose of this motion on its merits for, despite the affidavit of the plaintiff, there seems to be little dispute on facts. Even so, the conflict between the First and Fifth Circuits in these same cases causes me considerable hesitation, particularly in this Circuit which regards summary judgment with perhaps less favor than others.

Under all the circumstances, it seems to me that the better policy would be to make haste slowly. The plaintiff, through no fault of her own, has been placed in a difficult position. In my judgment, her case is entitled to a thorough consideration including the testimony of expert witnesses which is bound to be helpful to a Court quite ignorant of the highly technical knowledge forming the background of the patents in the suit.

The defendant's motion is denied. An Order will be entered in accordance herewith.