IMPERIAL BRASS MFG. CO. v. BONNEY FORGE & TOOL WORKS, Inc.

No. 409.

District Court, E. D. Pennsylvania.
March 12, 1941.

830

Swartz, Campbell & Henry and Ward C. Henry, all of Philadelphia, Pa., and Will Freeman and Vernon D. Beehler, both of Chicago, Ill., for plaintiff.

Howson & Howson and Charles H. Howson, Jr., all of Philadelphia, Pa., and Frederick Griswold, Jr., of New York City, for defendant.

KIRKPATRICK, District Judge.

This is a suit for infringement of letters patent No. 1,724,697 to Dobrick.

For a number of reasons, when connections in copper tubing are to be made, the most satisfactory results can be obtained by flaring the ends of the tubes. This is the principal use of the patented device, which is called a flaring tool. It is intended to be carried in a repairman's kit. As a result of the increase in the use of copper tubing in home refrigerating apparatus, water piping, gas stove assemblies, and in the automotive and airplane fields, flaring tools have become ordinary service equipment.

Claims 1, 2, 5, 9, and 10 of the patent are in suit. Infringement is denied, but there is very little question that the claims are infringed by the defendant's device, and I so find.

The claims generally are for a combination of a pair of clamping bars between which the tube to be flared is held tightly through one of a number of different sized holes, and a yoke loosely mounted upon the clamping bars so that it can be moved to a position immediately over the tube. The yoke has a threaded, descending member which by reason of its pointed end seats itself accurately in the end of the tube, and at its opposite side inwardly projecting flanges which clutch the clamping bars. As the flaring member is screwed down into the end of the tube, the whole assembly is pulled together and the flanges of the yoke, holding the clamping bars fast, form a base against which the thrust of the flaring member on the tube is exerted.

The defendant has raised certain issues of priority of invention, prior public use, laches and abandonment. All of these issues I have decided in the plaintiff's favor and will discuss them at the end of this opinion.

The remaining issue is the validity of the patent, the question being invention over the prior art. My conclusion is that the patent is valid.

The major elements of the combination claimed are the yoke and the clamping bars. It must be conceded that there is nothing new, or at least nothing showing any inventive improvement, about the clamping bars of the patent. Clamping bars with graduated holes for grasping various sizes of pipe appear in half a dozen earlier patents, for example, Harburg, 1,451,727. Any advance which the clamping bars of the patent may disclose over these is nothing more than ordinary mechanical improvement. The loose yoke, movable in any direction, and resisting the thrust of its flaring member by the inturned flanges does not appear in any prior device.

The defendant argues that the combination is open to the objection that what it discloses is nothing more than an improvement of one part of an old combination, giving no right to claim the whole. Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008. This rule, however, does not apply in cases where, by reason of a change in one element, a new mode of co-operation between the two is achieved. In the present patent the changes in the yoke cause it to coact with the bars in a new mode.

With a yoke free to move in any direction about the clamping bars, the conical end of the flaring tool naturally falls into the exact center of the end of the pipe without the necessity of mechanical adjustment and thus "centers itself." This is unquestionably a matter of real importance. If the point of the flaring tool is not accurately seated in the middle of the tube when the force is exerted, you will get a lopsided flare; and a connection made with a tube which is not accurately and uniformly flared is bound to be leaky and unsatisfactory. This strikes me as a new functional relationship between the elements of the combination. I cannot find a single structure of the prior art in which it appears. Of course, the devices of the

prior art do provide for accurate flaring, but in an entirely different way. Thus the Rudolph device, which was the one generally sold by the plaintiff before it adopted the tool of the patent, was a rigid assemblage with the member corresponding to the yoke made integral with the member corresponding to the clamping bars. It was in a sense a precision tool, and had to be very accurately machined to make perfect flares. To provide for various sizes of tubing, quite a number of small semicircular pieces or dies were supplied, which were inserted into the rigid frame below the flaring tool to hold the tube.

Changing from one size to another involved rather careful manipulation if the tube was to be accurately set for flaring.

There are prior art devices in which the yoke is movable, but not in all directions. For example, in Hartsock, No. 1,571,267, the flaring tool swings on a pivot through an arc and the clamping bars are constructed so that the holes for the tubes will come precisely in its arc. Here again most of the positioning of the flaring tool is accomplished by the rigid construction. The same is largely true of the Conley and Walters patents.

What at first glance appears to be the closest of the prior art patents having a movable yoke is the Hatton patent, No. 1,101,434. But an examination of this structure, both as described in the patent drawings and as exemplified by the model produced at the trial, shows that, while the yoke is intended to be detachable, there is not the slightest indication that when the power screw is in operation and the flaring tool descending, it is to have any loose play which will assist in centering the flaring tool. The yoke must first be slid along the clamping bars (it cannot be moved laterally) to a position in which the flaring tool will be exactly centered over the head of the tube. It then must be rigidly held in place by screws, otherwise it will slip and the device will pull apart under pressure. The whole operation is fundamentally different from that of the Dobrick patent. In addition, though not of controlling importance, it may be noted that the Hatton patent was a shop tool intended to be affixed to a table.

The construction disclosed by the Dobrick patent gave the art for the first time a portable tool of simple construction and few parts, not requiring any particular skill to operate, and competent to produce an absolute accurate flare without the necessity of precision construction. It presents a combination, the elements of which function co-operatively in a new manner. This new manner of operation produces a definitely useful result, as plainly demonstrated by the manner in which the machine was received by the plaintiff's customers and the ease with which it was substituted for the older device.

This new functional relationship, while not expressly claimed, is nevertheless inherent in the disclosure. The description of the yoke, appearing in several of the claims—"movable along the clamping bars so that when the yoke is moved to bring the flaring member in registration with the selected recesses and the flaring member is turned to flare the end of the tube secured therein, the yoke will be clamped to the clamping bars"—is quite sufficient to cover it, if the specification be read and the patent drawing referred to.

It is, of course, a minor invention, but it creates something new and useful and, to the best of my judgment, lies beyond the scope of the ordinary improvements to be expected in the normal course of mechanical development of the art.

The remaining issues may be disposed of by fact findings:

1. I find that the date of the invention of the Dobrick patent was in the autumn of 1919.

2. I find that the evidence offered to show a prior public use or sale of the Helminiak device more than two years prior to the application date of Dobrick (which was April 4, 1927) is insufficient to establish that fact. I reject the testimony upon this point as too uncertain to be accepted as the basis of fact findings (U.S. C.A., T. 35, Sec. 31, annotations page 483), and find that the Helminiak device was not in public use or on sale for more than two years prior to the Dobrick application.

3. I find that Dobrick did not abandon his invention and that he was not guilty of laches invalidating the grant of the patent to him.

The facts relating to this last issue are found to be as follows:

In 1919, the Imperial Brass Manufacturing Company, the plaintiff, decided that it would enter the market with a flaring tool for service kits. Rudolph, its chief engineer, went to work upon this problem, and, in the summer of 1919, designed a

tool, which was subsequently embodied in the Rudolph patent, No. 1,372,197. About the same time, or a little later, Dobrick, who was an executive employee in charge of manufacturing, also designed and made a model of a tool, which was later embodied in his patent. Both designs were submitted to Mr. McNellis, the president of the company, and he selected and approved the Rudolph tool, for the curious reasons that Dobrick's was too simple, and that the Rudolph tool "was boxed up and it looked like a high grade tool, * * * more of a tool of the class our trade would buy."

The patent for the Rudolph tool was applied for, and the Company took up its production. Dobrick was instructed to put his device "away where we might have it if we wanted it at some future day to develop it further and take it up in case the other tool did not hold the market, or that a simpler tool was wanted at a later day." In pursuance of this, his model and his original drawings were kept by him in his desk, and the head of one of the sales divisions who had been consulted by him in making the tool testified that he said to him, " 'Let's just wait and see how the other tool sells, and maybe our judgment will be vindicated after all.' So he just took the tool and put it away in his office, I presume." After marketing the Rudolph tool over a period of about eight years, the Company found its sales petering out and decided to take up and produce the Dobrick tool. The patent was applied for in April, 1927, or about eight and one-half years after the invention. The tool was successful in a highly satisfactory degree, and it is quite evident, from comparison with the sales of the Rudolph tool, that the merit of the device itself was the principal cause of its success.

█ Of course, eight years is a long time to withhold an invention, but it has been held in scores of decisions that mere lapse of time before an inventor applies for a patent does not, per se, constitute abandonment. It may, but not where the delay is explained in such a manner as to show that there was no intention to abandon. The whole question is one of fact, and depends upon the intention of the inventor. Electric Battery Co. v. Shimadzu, 307 U.S. 5, 15, 59 S.Ct. 675, 83 L.Ed. 1071; McGrath .v. Burke, 56 App.D.C. 320, 12 F.2d 161; J. E. Hanger, Inc. v. J. F. Rowley Co., 54 App.D.C. 336, 298 F. 359.

As respects abandonment, every reasonable doubt should be resolved in favor of a patent. Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 92 F.2d 330, reversed on other grounds, 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34.

In the present case it seems to me that the facts indicate rather definitely an intention not to abandon. At any rate, they do not present a case of unexplained delay under circumstances from which the only reasonable inference is that of an intention to abandon. Dobrick was an employee of the Brass Company. He was obviously in no position to market his device except through the Company's taking it up. Of course, he had his position to consider and could not be expected to risk it by competing with his employer or by exhibiting his device for sale to another manufacturer. There is no ground on which to reject the entirely reasonable explanation that he was holding his device in reserve, either for his employer or some other in case his employment should be terminated.

This is not the case of an attempt to prolong a monopoly such as invalidated the grant of the patent in Macbeth-Evans Glass Co. v. General Electric Co., 6 Cir., 246 F. 695. None of the decisions cited by the defendant which find abandonment on the basis of an undue prolongation of the monopoly are based on situations where the inventor who refrains from patenting his device for an extended period makes no effort whatever to exploit it during that period or to get any advantage from the delay.

Nor is the case that of an inventor stimulated into activity by the appearance on the market of another device embodying his invention. The Helminiak patent issued before Dobrick's, but there is no evidence that Dobrick knew anything about it until long after he had made his application. The cause which moved him to apply was the altogether simple one that his Company was ready to take up his patent and market it.

Nor was there laches, or estoppel grounded upon the intervening rights of third parties or upon the misleading of others into expenditure of money in the belief that the invention was free to the public.

█ My conclusions of law are:
1. That the patent in suit is valid.
2. That the plaintiff is entitled to a decree as prayed for.